IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAYMOND COOPER,                          )
                                         )
          Petitioner,                    )
                                         )
     v.                                  )          No. 08 C 5792
                                         )
UNITED STATES OF AMERICA,                )
                                         )
          Respondent.                    )

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

     Petitioner Raymond Cooper has filed a "Motion to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody" under 28 U.S.C. § 2255 (Dkt. No. 1). The

government has responded and, for the reasons set forth below, petitioner Cooper's motion is

denied.

BACKGROUND

     On July 26, 2001, a federal grand jury charged Raymond Cooper ("Cooper") and his co-

defendants, Kalonji McMillian ("McMillian") and Sedgwick Johnson ("Johnson"), with one

count of conspiracy to possess with intent to distribute and to distribute cocaine and cocaine

base, in violation of 21 U.S.C. § 846, one count of possession with intent to distribute cocaine, in

violation of 21 U.S.C. § 841(a)(1), and one count of possession with intent to distribute cocaine

base, in violation of 21 U.S.C. § 841(a)(1). *United States v. Cooper*, 01 CR 543 (N.D. Ill.) (Dkt.

No. 17). All three defendants pleaded not guilty and proceeded to trial before a jury.

The facts, as presented at trial, are as follows:

The government's case against the defendants stems from the June 5, 2001 arrest of an individual named Jason Rauner ("Rauner"), who was arrested when he attempted to sell approximately one kilogram of cocaine to a confidential source. While in custody, Rauner named Cooper as his supplier and agreed to cooperate with law enforcement officials by arranging a future delivery of cocaine from Cooper.

From June 6, 2001 through June 8, 2001, law enforcement officials recorded numerous telephone calls between Rauner and Cooper, and voicemail messages left by Cooper on Rauner's phone, as Rauner and Cooper negotiated the specifics of the upcoming drug sale.[1] Rauner and Cooper also met face-to-face at a Bennigan's on June 6, 2001, as part of these negotiations.[2] At trial, Rauner testified that he and Cooper had arranged for Cooper to supply Rauner with one kilogram of powder cocaine and one kilogram of crack cocaine. Cooper told Rauner that McMillian, known as "TuTu," would be the individual responsible for cooking the cocaine into crack.

On June 8, 2001, at approximately 12:30 p.m., law enforcement officials observed

---

[1] The majority of the conversations between Cooper and Rauner were presented to the jury in the form of audiotapes. Rauner, who was a government witness at the trial, helped the government agents prepare transcripts of these recorded conversations, and the transcripts were used at trial as an aid in listening to the audio recordings. Additionally, certain portions of the audiotapes were interpreted by Rauner at trial, and Rauner also testified to the content of the conversations according to his independent recollection. For ease of explanation, the court will use the phrase "Cooper told Rauner" (or similar language) to indicate trial evidence presented to the jury in this fashion, unless otherwise noted.

[2] Although the June 6, 2001 Bennigan's conversation was recorded by law enforcement officials, no audiotape of this conversation was introduced at trial.

McMillian arrive at Cooper's residence, retrieve a white plastic bag with black markings from the trunk of his car, and then walk with Cooper into Cooper's house.

Later that day, at approximately 2:15 p.m., Cooper met with Rauner in the parking lot of a Sleep Inn.[3]  Cooper invited Rauner to come to Cooper's residence to watch McMillian cook the cocaine, but Rauner declined.  Cooper also confirmed that Rauner wanted one kilogram of powder cocaine and one kilogram of crack cocaine, and he informed Rauner that, according to McMillian, the cooking process would take about an hour.

At approximately 6:18 p.m. on June 8, 2001, Cooper returned to the parking lot of the Sleep Inn and again met with Rauner.[4]  When Rauner asked Cooper how much he owed McMillian for cooking the cocaine into crack, Cooper told him the fee was $500.  Cooper asked Rauner where he wanted the cocaine delivered, and Rauner told Cooper to put the bag carrying the drugs on the passenger seat of Rauner's vehicle.  Cooper then relayed Rauner's instructions over the phone, and Johnson arrived in his vehicle, pulled up next to Rauner's vehicle, and placed a white plastic bag with black markings in Rauner's vehicle.  Cooper and Johnson then left the parking lot of the Sleep Inn together.

Officer Todd Arthur of the Cook County Sheriff's Office ("Officer Arthur") testified that, after Rauner's meeting with Cooper on the evening of June 8, 2001, Officer Arthur retrieved a

---

[3] Government agents made a video recording of this meeting.  Additionally, Rauner wore a hidden microphone to this meeting, through which government agents recorded Rauner's conversation with Cooper.  Both the video and audio recordings were played to the jury at the trial.

[4] Government agents also made a video recording of this meeting, and Rauner wore a hidden microphone to this meeting.  Both the video and audio recordings were played to the jury at the trial.

white plastic bag with black markings from the floor of the front passenger side of Rauner's vehicle containing a brick of suspected powder cocaine wrapped in clear cellophane, two clear ziplock bags containing suspected crack cocaine, and a third bag containing suspected crack cocaine. The defendants each stipulated that the substances found in the white plastic carrying bag were, in fact, approximately one kilogram of powder cocaine and slightly more than one kilogram of cocaine base. Government expert Mary Beth Thomas testified that Cooper's fingerprints were found on the white plastic carrying bag as well as on one of the ziplock bags containing cocaine base; that McMillian's fingerprint was found on the other ziplock bag containing cocaine base; and that Johnson's fingerprint was found on the white plastic carrying bag. The government also presented telephone records demonstrating that Cooper was in constant contact with Rauner, McMillian, and Johnson on June 8, 2001.

At trial, Rauner testified that he began purchasing powder cocaine from Cooper in 1996 and crack cocaine from Cooper in 1998. Rauner also testified that, when Rauner purchased crack from Cooper, McMillian was the individual who cooked the cocaine into crack. Rauner testified that he witnessed McMillian cooking the cocaine in person, and typically paid Cooper $500 per kilogram of crack cocaine as a fee for McMillian's cooking services. Rauner also testified that Cooper often "fronted" the cocaine to Rauner, selling the drugs to Rauner on consignment, and Rauner witnessed Cooper and McMillian using each other's contacts to buy and sell drugs. Rauner testified that he also bought powder cocaine and crack cocaine directly from McMillian in 1998 and, in 2000, Rauner sold cocaine to both Cooper and McMillian on several occasions.

At the conclusion of the trial, the jury found each defendant guilty on all three counts

charged in the indictment.  (01 CR 543, Dkt. Nos. 82-84.)  Cooper was sentenced on February

18, 2003, to a term of 360 months of imprisonment, followed by a five-year term of supervised

release.  Cooper timely appealed and argued that insufficient evidence existed to support his

conviction, that the government engaged in sentencing entrapment by inducing Cooper to sell

crack cocaine in addition to powder cocaine, that the district court erred in allowing Rauner to

testify from transcripts of tape recordings and by allowing the jury to use those transcripts during

its deliberations, and that Cooper's sentence violated the Sixth Amendment pursuant to *United

States v. Booker*, 543 U.S. 220 (2005).  *See United States v. Johnson*, No. 03-1477 (7th Cir. May

4, 2005) ("7th Cir. May 4, 2005 Order").  The Seventh Circuit rejected Cooper's arguments

regarding the sufficiency of the evidence, sentencing entrapment, and the jury's use of

transcripts, and found that Cooper waived his challenge to Rauner's use of the transcripts during

trial when Cooper's counsel "stated he had no objection." *Id.* at 8.  The Seventh Circuit also

ordered a limited remand of the defendants' sentences pursuant to *United States v. Paladino*, 401

F.3d 471 (7th Cir. 2005).  This court advised the Seventh Circuit that it would reimpose the same

sentences, and on June 1, 2007, the Seventh Circuit affirmed the defendants' sentences.  (01 CR

543, Dkt. No. 156); *United States v. Johnson*, 240 F. App'x 131 (7th Cir. 2007).  Cooper filed a

petition for certiorari with the Supreme Court of the United States, which was denied on October

9, 2007.  *Cooper v. United States*, 552 U.S. 972 (2007).  On October 9, 2008, Cooper timely

filed the pending § 2255 motion.

## LEGAL STANDARD

Under § 2255, "[a] prisoner in custody under sentence of a [federal] court . . . may move

the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. §

2255(a).  "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon."  28 U.S.C. § 2255(b).

Generally, claims not raised on direct appeal are procedurally defaulted and may not be raised on collateral review under § 2255 in the absence of cause and prejudice.  *Massaro v. United States*, 538 U.S. 500, 504 (2003).  However, a claim for ineffective assistance of trial counsel may be raised for the first time on collateral review.  *Id.* at 509.

ANALYSIS

Cooper argues in his § 2255 motion that his conviction should be vacated, because (1) Cooper received ineffective assistance of counsel at both the trial and appellate levels; (2) the court erroneously allowed Cooper's counsel to withdraw a previously-filed motion to withdraw; and (3) the prosecution withheld exculpatory evidence from Cooper in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  For the reasons stated below, the court finds that Cooper is not entitled to relief under § 2255, and his motion is therefore denied without a hearing.

I.      Cooper's Claim for Ineffective Assistance of Counsel

To succeed on a claim for ineffective assistance of counsel, the movant must show that: (1) the attorney's performance fell below an objective standard of reasonableness; and (2) this deficient performance resulted in prejudice to the defense.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  If the movant fails to establish either of the two prongs above, the court's analysis may end without considering the other prong.  *Id.* at 697.

An attorney's performance will only be considered deficient for purposes of an ineffective assistance of counsel analysis if it falls "outside the wide range of professionally

competent assistance." *Id.* at 690. Attorney performance is evaluated from a highly deferential point of view, and there is a "strong presumption" that attorney conduct was reasonable. *Id.* at 689. Care must be taken to avoid evaluating counsel's performance with the benefit of hindsight, and to instead consider the challenged conduct "from counsel's perspective at the time." *Id.* Attorneys are not obligated to "pursue every conceivable avenue; they are entitled to be selective." *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir. 1993).

A petitioner alleging ineffective assistance of counsel must also demonstrate that his attorney's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 693. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.*

A.      Ineffective Assistance of Trial Counsel

Cooper articulates at least seventeen reasons that he believes he received ineffective assistance of counsel at trial. (Dkt. No. 6 ("Cooper's Mem.") at 10-43.) For ease of discussion, the court has organized and consolidated Cooper's arguments into two separate groups: claims regarding specific acts or omissions by Cooper's trial counsel and claims regarding the overall performance of Cooper's trial counsel.

Cooper was initially represented by attorney Thomas Royce ("Royce") during the preliminary examination and detention hearing held in June 2001. When it became clear that Royce had a potential conflict of interest in representing both Cooper and McMillian, Royce withdrew his representation of Cooper and attorney Ralph Meczyk ("Meczyk") filed an

appearance on Cooper's behalf. On June 25, 2002, the court[5] scheduled the defendants' jury trial

to begin on September 9, 2002. Meczyk thereafter represented to both Cooper and the court that

he would not be able to represent Cooper at the September 9, 2002 trial, due to an earlier

scheduled trial in the Central District of California. (*See* 01 CR 543, Dkt. No. 53 ("Motion for

Extension of Time").) The court denied Cooper's motion to re-set the trial date, and Meczyk

withdrew his representation of Cooper. Attorney Santo Volpe ("Volpe") then filed an

appearance on Cooper's behalf. On September 9, 2009, the court re-set the trial date for October

15, 2002, at which point trial proceeded as scheduled. Unless otherwise specified, all references

to Cooper's trial counsel should be construed as references to Volpe.

1.      Specific Acts or Omissions

        a.      Conspiracy to Deny Cooper the Right to Counsel of His Choice

        In agreeing to Volpe's substitution, Cooper contends that he relied on Volpe's

representations that Meczek had a trial in California and "that he, Volpe, had worked with

attorney Meczek on the case." (Cooper's Mem. 13.) Cooper asserts that he subsequently

learned "that attorney Meczek did not have any trial in California, during the time of his court

proceedings and trial," and he contends that Meczek and Volpe together conspired "to deny

[Cooper] the attorney representation of Meczek." (*Id.* at 14.)

        It is undisputed that Meczek was, in fact, on trial in California from September 3, 2002

through September 26, 2002, as represented by the criminal docket sheet in *United States v.

Assaf*, 5:01-mj-00106 (C.D. Cal.) (Gov't Ex. A), of which this court takes judicial notice.

---

[5] Judge Charles P. Kocoras presided over the pretrial proceedings in this case from the time of the indictment through October 1, 2002, at which point the case was reassigned to this court.

Cooper nevertheless argues that the evidence "clearly establishes a conspiracy" (Dkt. No. 15 ("Cooper's Reply") at 2), because Meczek's California trial had ended by the time Cooper's trial began on October 15, 2002, and Meczek was therefore available to represent Cooper at his trial in the Northern District of Illinois.

The court rejects this argument as meritless. Meczek had a verifiable scheduling conflict at the time he withdrew from representing Cooper on September 5, 2002. Neither he nor Volpe made any misrepresentation to Cooper in this regard. Meczek attempted to resolve this conflict by extending the September 9, 2002 trial date, but his efforts were unsuccessful. On the record before the court, there is no evidence to indicate that these two attorneys conspired to deprive Cooper of the counsel of his choice in violation of the Sixth Amendment. Cooper's argument for ineffective assistance of counsel on this point is therefore without merit.

      b.      <u>Withdrawal of Previously-Filed Motion to Withdraw</u>

As set forth above, after Volpe's initial appearance on Cooper's behalf, the September 9, 2002 trial date was re-set to October 15, 2002. Less than two weeks before trial, on October 4, 2002, Volpe filed a motion to withdraw, stating in relevant part:

> Preparation continued [after September 9, 2002]. However, <u>very recently</u>, irreconcilable differences have arisen between the Defendant and Mr. Volpe; as of this time, absent a clarification and understanding between Mr. Cooper and his (current) attorney, they cannot be resolved. Many of these reasons may not [sic] disclosable because of the attorney-client privilege. Your Honor (along with several of your fellow judges) has known Mr. Volpe for over 30 years. Hopefully Mr. Volpe's reputation with the judges and legal community of the Northern District of Illinois is such that you will rely on Mr. Volpe's word that these differences are of such a nature, that at the current time, absent resolution, Mr. Volpe is in no position to render the effective assistance of counsel to which Mr. Cooper is undeniably entitled.

(01 CR 543, Dkt. No. 63 ¶ 8 (emphasis in original).) Volpe later withdrew his motion, and he

proceeded to represent Cooper throughout the duration of the pre-trial and trial proceedings.

Cooper argues that the court should accept as true Volpe's "stunning admission" that he was "in no position to render the effective assistance of counsel to which Mr. Cooper is undeniably entitled." (Cooper's Mem. 21.) However, in making this contention Cooper omits a crucial portion of Volpe's statement—that he could not effectively represent Cooper *absent resolution of their differences*. In a sworn affidavit submitted by the government, Volpe attests that he withdrew his motion because he and Cooper were able to resolve their differences. (Gov't Ex. B ("Volpe Aff.") ¶ 7.) Cooper does not argue that this is an inaccurate representation of the events that transpired, but he maintains that "a hearing is most certainly required" to "ascertain[ ] in the record the hidden reasons behind the motion." (Cooper's Reply 4.) The court disagrees. It is undisputed that Cooper and Volpe had a conflict of interest, and it is undisputed that the conflict was later resolved. The precise nature of the conflict is irrelevant. So long as the conflict was, in fact, resolved, it was not objectively unreasonable for Volpe to withdraw his motion. The court therefore finds no ineffective assistance of counsel on this point.

c.     <u>Failure to Inform Cooper of Plea Offer and/or Pursue Plea Negotiations</u>

Cooper next argues that Volpe was ineffective for "failing to (i) advise him of any plea offer of the government and further by (ii) failing to pursue plea negotiations." (Cooper's Mem. 39.) The first part of this argument assumes that the government in fact communicated a plea offer to Volpe, but Cooper has cited no evidence in support of this supposition. Volpe has attested that he does not recall engaging in any plea negotiations on Cooper's behalf, and counsel for the government, Lawrence Oliver, attests that to the best of his recollection the government did not engage in any plea negotiations with Volpe. (Volpe Aff. ¶ 6; Gov't Ex. D ("Oliver Aff.")

¶ 3.)  Although Cooper stresses that these two affidavits "do[ ] not make clear that no plea offer was ever made," Cooper does not cite any evidence that would affirmatively suggest a plea offer *was* made.  Cooper's counsel cannot have been ineffective for failing to communicate the terms of a non-existent plea offer to Cooper.

To the extent Cooper argues that Volpe "was further ineffective by failing to seek plea negotiations" (Cooper's Mem. 40), Cooper has failed to demonstrate prejudice.  Counsel for the government attests to his recollection that "the parties had little to offer each other through a plea bargain" and "the circumstances of the case left little room for negotiation."  (Oliver Aff. ¶ 3.) There is simply no evidence from which the court could find a reasonable probability that the government would have offered Cooper a plea agreement if Volpe had pursued this course of action.

d.    Entrapment Defense

Cooper also argues that Volpe was ineffective for failing to pursue an entrapment defense and for conspiring with Royce to deny Cooper the ability to pursue this defense, in violation of Cooper's express wishes and Cooper's right to counsel free from conflicts of interest.

The court accepts as true Cooper's representation that, at some unspecified time, he informed Volpe that he wanted to pursue an entrapment defense.  (Dkt. No. 5 ("Cooper Aff.") ¶ 9.)  However, the record also indicates that Cooper affirmatively chose to forego this defense at trial.  (Trial Tr. 560:18-25.)  Moreover, a decision to pursue or abandon a particular defense "falls squarely within the realm of trial strategy and is thus subject to a strong presumption that the decision constituted effective advocacy."  *George v. Smith*, 586 F.3d 479, 487 (7th Cir. 2009); *see also United States ex rel. Cole v. Lane*, 752 F.2d 1210, 1220 (7th Cir. 1985)

("[d]ecisions to pursue or abandon defenses are tactical choices of trial strategy").  Unless Cooper can show that it was objectively unreasonable for Volpe to advise him to abandon the entrapment defense, Cooper's claim for ineffective assistance of counsel on this point cannot succeed.

Cooper contends that Volpe should have relied on the following facts and arguments to support an entrapment defense: "(i) Rauner approached Cooper at the Government's request; (ii) Rauner proposed the deal and the terms were set by the government; (iii) Cooper was not predisposed to the deal, because he had just spent the first five months of 2001 in jail and had not been involved in the drug trade; (iv) Cooper was released from federal prison less than a month prior to the June 8th drug deal; and (v) the government and Rauner aggressively pursued the deal, telephoning often over the three day period prior to the drug deal."  (Cooper's Mem. 24 (citations omitted).)  In response, the government points to evidence in the record tending to negate an entrapment defense, including: (1) Rauner's testimony that he bought cocaine and crack from Cooper on numerous occasions over a period of years; (2) Rauner's possession of a kilogram of cocaine at the time of his arrest on June 5, 2001, which he testified was supplied by Cooper; (3) Cooper's ability to acquire the cocaine and crack that he sold to Rauner on June 8, 2001 without government assistance; and (4) Cooper's role as the individual solely responsible for setting the price for the drugs.  (Dkt. No. 12-2 ("Gov't Resp.") at 11.)  The government further notes that an entrapment defense would likely have opened the door to the admission of Cooper's prior felony conviction for conspiracy to distribute cocaine.  (*Id.* at 11-12.)  In light of the likely futility of pursuing an entrapment defense, as well as the prejudicial impact of revealing the details of Cooper's prior felony conviction to the jury, the court finds that Volpe's

strategic decision to advise Cooper not to pursue an entrapment defense was not objectively unreasonable.

Cooper further argues that he received ineffective assistance of counsel because it was Royce, not Volpe, who ultimately convinced Cooper to abandon the entrapment defense, and Royce was laboring under a conflict of interest. (Cooper's Mem. 23, 25-26.) To the extent Royce can be seen as representing Cooper in this regard, Cooper's argument nevertheless fails because Cooper has not demonstrated "an actual conflict of interest adversely affect[ing] [Royce's] performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). Cooper argues that the entrapment defense "would put [McMillian] into the crime" (Cooper's Mem. 25) and "would have placed McMillian in the crime" (Cooper's Reply 13), thereby creating a conflict between their two defense positions, but the court is at a loss to understand how. In Cooper's words, McMillian's defense was "that he had nothing to do with the drug transaction." (Cooper's Mem. 25.) None of the evidence now stressed by Cooper in support of an entrapment defense implicates McMillian in any way, instead focusing on the actions of Rauner and the government agents with whom Rauner was cooperating. Moreover, as discussed above, it was not objectively unreasonable for Cooper to forego an entrapment defense. Because Cooper has not shown that Royce's advice was adversely affected by an actual conflict of interest, his argument on this point fails.

      e.    <u>Failure to Seek Severance</u>

In a related argument, Cooper contends that Volpe should have filed a severance motion, because "the joint trial compromised his trial right to present a defense [of entrapment]." (Cooper's Mem. 27.) Cooper again takes the position that his entrapment defense "would have

implicated" McMillian, and argues that this conflict "required a severance from McMillian." (Cooper's Reply 14.)

Cooper did not in fact raise an entrapment defense at trial, thus negating the underlying thrust of Cooper's argument for severance. Additionally, even if Cooper had pursued an entrapment defense, the court has found no actual conflict between Cooper's entrapment defense and the defense pursued by McMillian at trial. Because Cooper has failed to articulate any alternative grounds for severing his case from McMillian's, Cooper cannot demonstrate that the failure to file a motion to sever constituted ineffective assistance of counsel.

      f.    <u>Failure to Articulate Defense Theory</u>

Cooper contends that, in light of Volpe's failure to argue an entrapment defense, "there was no actual theory of innocence or defense" presented to the jury in Volpe's opening statement or closing argument. (Cooper's Mem 22.) The court has already determined that it was not objectively unreasonable for Volpe to choose not to pursue an entrapment defense in this case, and Cooper does not articulate any other defense that would have been appropriate or effective in light of the evidence presented at trial. Not every trial is amenable to a "theory of innocence or defense," as Cooper argues. In his opening statement and closing argument, Volpe stressed that Rauner was biased and not credible, that the transcripts were faulty and the tapes inaudible, and that altogether there was insufficient evidence to convict Cooper beyond a reasonable doubt. (Trial Tr. 241-244; 1316-1332.) This was not an objectively unreasonable approach to Cooper's defense, and Cooper cannot demonstrate any prejudice arising from Volpe's failure to take a different, but unspecified, approach in this case.

g.    Tapes and Transcripts

The government's case in chief consisted of more than two dozen tape recordings of conversations held between Rauner and Cooper, as well as voice messages left by Cooper on Rauner's phone, which were admitted as evidence. Rauner assisted the government in preparing transcripts of these recordings for the jury's use at trial as an aid in evaluating the recordings. Cooper argues that Volpe was ineffective for (1) failing to prepare an alternative set of transcripts; (2) failing to object to the accuracy of the transcripts submitted by the government; (3) failing to object to the use of the tapes on the grounds that they were "intermittently inaudible"; and (4) failing to object to Rauner's use of the transcripts at trial. (Cooper's Mem. 28-31.)

Cooper's arguments in this regard generally fail for lack of prejudice. Cooper first argues that, "[b]ecause the taped recordings were inaudible, attorney Volpe should have caused an alternative set of transcripts to be prepared for submission to the jury" and "[h]ad counsel submitted an alternative set of transcripts, the jury would have had at its disposal the alternative translations with which to compare." (Cooper's Mem. 29-30.) Cooper identifies one instance at trial in which Royce described one of the tapes as "unintelligb[le]" (Trial Tr. 368) and one instance when counsel for the government noted that there is some "interference" on the tapes in general (Trial. Tr. 326). However, Cooper does not explain the expected content of an alternative set of transcripts, how the alternative transcripts would differ from the transcripts prepared by the government and used at trial, or why the outcome of the trial would have been different if an alternative set of transcripts had been prepared. In light of the considerable amount of evidence presented against Cooper at trial, the court finds no reasonable probability

that any transcription errors that occurred in the identified portions of the recordings[6] would have significantly impacted the outcome of Cooper's trial.

Similarly, in arguing that Volpe should have objected to the accuracy of the government's transcripts, Cooper does not identify any portion of the transcripts which he contends was inaccurate. Cooper asserts that an objection to the transcripts would have led to the court holding a hearing for purposes of assessing the transcript's accuracy, but he does not explain how this hearing would result in a reasonable probability that the outcome of Cooper's trial would have been different.

Cooper argues in his reply brief that he "was never permitted to listen to any of the taped recordings . . . with the transcripts prepared by the government," thus explaining his inability to identify any specific errors in the transcripts. (Cooper's Reply 17.) Assuming that Cooper's access to the evidence is in fact so restricted, it would appear that Cooper is merely speculating that the transcripts could contain errors that were prejudicial to his defense. The only explanation Cooper gives for his suspicions in this regard is his citation to the two portions of the trial transcript discussed above, which the court has found to be unprejudicial in light of the substantial evidence presented against Cooper at trial. Without more, Cooper's belated request that the court "expand the record . . . to provide Cooper the opportunity to listen to all taped recordings, along with the transcripts, to identify inaccuracies" (Cooper's Reply 17) amounts to no more than a fishing expedition, and is denied.

---

[6] The recording that Royce described as having problems with "unintelligibility" covered Cooper's explanation of why he was not ready to deliver the powder cocaine and crack cocaine to Rauner on the morning of June 8, 2002—because McMillian had not yet had time to cook the cocaine into crack. (Trial Tr. 368.)

Cooper further argues that Volpe should have objected to the "use" of the tapes at trial.[7] As mentioned above, Cooper has identified only one specific instance when one of the recordings was described as having problems with "unintelligbility." (Trial Tr. 368.) However, the partial inaudibility of an audio recording goes to the weight of the evidence, not its admissibility. *United States v. Robinson*, 956 F.2d 1388, 1395 (7th Cir. 1992). As this court has previously observed with regard to the tapes presented as evidence in this trial, "The comments by the lawyers and the court regarding inaudibility addressed only isolated portions of the tapes and do not reflect any substantial concerns about the tapes' overall reliability. Moreover, this court heard the audiotapes during [the defendants'] trial and has no independent recollection of any such defects." *McMillian v. United States*, No. 08 C 5828, 2010 WL 3526500, at \*5 (N.D. Ill. Sept. 1, 2010). Cooper's citations to the record fail to demonstrate a reasonable probability that the tapes would not have been admitted into evidence, or that the outcome of Cooper's trial would have been different, had Cooper's attorney objected to the admission of the tapes as a whole.

Cooper contends that, "[h]ad counsel objected [on grounds of inaudibility], there is a reasonable probability that the court might have been more open to counsel's objection to the jury using the transcripts of the tapes." (Cooper's Mem. 31.) The court disagrees. At trial, the court instructed the jurors numerous times that "it's the tape, not the transcript that's the evidence. You should rely upon your recollection of what you hear on the tape and not what's reflected in the transcript unless it's consistent with the tape to the best of your recollection."

_____

[7] The court interprets Cooper's argument to mean that Volpe should have objected to the admission of the tapes as evidence at trial.

(Trial Tr. 349:22-350:1; *see also* 7th Cir. May 4, 2005 Order 9 ("Throughout the trial . . . the district court repeatedly told the jury that the transcripts were merely aids, not evidence.").) Following these instructions, the jurors were able to independently evaluate the audibility of the tapes and reject any portions of the transcripts that were inconsistent with the content of the tapes. The court presumes that the jury followed these instructions. *United States v. Payne*, 741 F.2d 887, 891-92 (7th Cir. 1984). To the extent that an objection on the grounds of inaudibility would have raised the issue of possible errors in the transcripts, the court's instructions to the jury would have adequately addressed Cooper's concerns. Accordingly, Cooper has demonstrated no prejudice in this regard.

Finally, Cooper argues that Volpe was ineffective for failing to object to Rauner's use of the transcripts at trial; however, Cooper does not explain the grounds for any such objection. In its May 4, 2005 Order, the Seventh Circuit determined that "Cooper waived his challenge to Rauner's use of the transcripts during trial . . . as his counsel stated he had no objection." (7th Cir. May 4, 2005 Order 8.)[8] Cooper now argues that, had Volpe raised an objection, "the Court of Appeals would have assessed Cooper's claim under a de novo review." (Cooper's Mem. 31.) Cooper is correct that the Seventh Circuit would not have considered an objection waived if Volpe had made an objection at trial, although the standard of review would likely have been for abuse of discretion. *See Romanelli v. Suliene*, 615 F.3d 847, 854 (7th Cir. 2010) (trial court's evidentiary rulings reviewed for abuse of discretion); *U.S. v. Harrison*, 431 F.3d 1007, 1011 (7th

---

[8] The government asserts that the Seventh Circuit "also addressed the argument on the merits" (Gov't Resp. 16), but this court disagrees. The Seventh Circuit addressed Cooper's challenge to the *jury's* use of the transcripts during its deliberations. It did not further address Cooper's challenge to Rauner's use of the transcripts during trial.

Cir. 2005) (trial court's decision to sustain or overrule objections to the form of the question reviewed for abuse of discretion); *Kaniff v. United States*, 351 F.3d 780, 787-88 (7th Cir. 2003) (trial court's decision to allow government to refresh witnesses's memories through use of computer records reviewed for abuse of discretion).  However, the mere fact that the Seventh Circuit would have considered the merits of the objection does not, by itself, demonstrate a reasonable probability that the outcome of Cooper's trial or appeal would have been different. Without any explanation of the grounds for an objection, the court cannot ascertain whether the objection would have been upheld, what impact the objection would have had on the evidence submitted at trial, or the overall impact of the objection on the outcome of Cooper's trial. Without more, Cooper cannot prevail on this argument.

  h. <u>Failure to Advise Cooper of Right to Testify / Failure to Call Cooper as a Witness</u>

  Cooper next contends that Volpe was ineffective for failing to advise Cooper of his right to testify at trial and refusing to call Cooper to the stand, despite Cooper's expressed wish to testify on his own behalf.  (Cooper's Mem. 37-39; Cooper Aff. ¶¶ 8, 10, 13.)  However, at trial the court advised Cooper of his right to testify and Cooper expressly waived that right.  (Trial Tr. 1109:14-1110:7.)  Cooper has not explained why there would have been a different outcome if Volpe had advised him of this right, as opposed to the court doing so.  Because Cooper cannot demonstrate prejudice, his claim for ineffective assistance of counsel fails on this point.

  2. <u>Overall Performance</u>

  a. <u>Failure to Investigate and Prepare for Trial</u>

  Cooper advances a number of arguments as to why Volpe was ineffective for failing to investigate and prepare for trial.  Cooper bases these arguments on his assertion that, at the time

of filing his October 4, 2002 motion to withdraw, Volpe "had not listened to the tapes, interviewed potential witnesses, reviewed the discovery provided, filed any applicable pretrial motions, caused an alternative translations [sic] of the tapes to be prepared nor familiarized himself with proper courtroom procedures." (Cooper's Mem. 16.) Cooper also asserts that, prior to trial, Volpe failed to "develop[ ] any facts to present the defense of entrapment" and failed "to investigate and discover exculpatory evidence with which to impeach Rauner." (Cooper's Mem. 26, 35.)

The evidence cited by Cooper to support these allegations is weak. First, Cooper cites Volpe's October 4, 2002 motion to withdraw, in which Volpe states in part that he "is in no position to render the effective assistance of counsel to which Mr. Cooper is undeniably entitled." (01 CR 543, Dkt. No. 63 ¶ 8.) As set forth in Section I.A.1.b. above, this statement is taken out of context. In whole, it refers to Volpe's inability to proceed absent the resolution of certain "irreconcilable differences" between Volpe and Cooper. (*Id.*) Elsewhere in the same motion, Volpe states that, after his appointment, he received Cooper's file from Meczek, spoke with counsel for McMillian and Johnson, "continued on with preparation," and "was busily preparing for trial." (*Id.* ¶¶ 3-4.) Volpe also states that, on September 8, 2002, he met with counsel for one of Cooper's co-defendants, conversed with "several members of the Cooper family," and visited Cooper. (*Id.* ¶¶ 5-6.) When Volpe ran into "preparation problems," he requested "a <u>very brief</u> continuance" on September 9, 2002. (*Id.* ¶ 7 (emphasis in original).) Thereafter, "[p]reparation continued." (*Id.* ¶ 8.) As a whole, Volpe's October 4, 2002 motion does not suggest that Volpe was unprepared to go to trial on October 15, 2002, or that he otherwise had not engaged in adequate investigation and preparation for Cooper's trial.

Cooper also cites his own affidavit, in which he attests that "I learned just prior to trial that attorney VOLPE never listened to the tapes" and "during trial, attorney VOLPE told me that the was not prepared for my trial." (Cooper Aff. ¶¶ 4, 18.) Cooper does not explain how he learned that Volpe "never listened to the tapes" and, without personal knowledge of this fact, Cooper's statement is unreliable. Volpe's statement to Cooper that he "was not prepared for [Cooper's] trial" is vague and does not support the specific allegations set forth in Cooper's memorandum.

Even if the court were to accept Cooper's unsupported allegations, his arguments on this point nevertheless fail because he has not established prejudice. Cooper's general position that he is entitled to relief simply because Volpe failed to investigate is incorrect. A petitioner alleging ineffective assistance of counsel for failure to investigate has the burden of making a "'comprehensive showing as to what the investigation would have produced.'" *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003) (quoting *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1133 (7th Cir. 1990)).

Cooper does argue that, had Volpe adequately investigated and prepared prior to trial, he would have uncovered the existence of two potential witnesses: Tammy Sherman ("Sherman") and Kenyea Beach ("Beach"). It is undisputed that, in January 2001, after being found in possession of four kilograms of cocaine, Sherman cooperated with the government in delivering the four kilograms of cocaine to Rauner and Beach. (*See* Cooper's Ex. B.) From these facts, Cooper speculates that both Sherman and Beach "could have, and would have . . . testified regarding [Rauner's] drug activities and . . . that he never delt [sic] in crack cocaine or cocaine base." (Cooper's Mem. 33-34.) This argument is pure speculation, and it has long been held

that "self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991). "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit." *Id.* Cooper has not attached any affidavits from Sherman or Beach attesting that they would have testified in the manner predicted by Cooper. As a general matter, the court finds it extremely unlikely that either Sherman or Beach would have the personal knowledge necessary to reliably make this type of sweeping statement about Rauner's drug activities. Moreover, any testimony regarding the specifics of the January 2001 drug sale would have been cumulative, as the jury was already aware that Rauner was involved in the purchase of four kilograms of cocaine on that date. (*See, e.g.,* Trial Tr. 261:21-262:16; 305:18-306:5.) With no evidence before the court about the expected content of Sherman and Beach's testimony, this court cannot find there is a reasonable probability that the outcome of Cooper's trial would have been different had Volpe called these witnesses to testify in Cooper's defense.

Cooper also argues that Volpe was ineffective for failing to uncover "exculpatory evidence with which to impeach Rauner," in the form of seven documents from 2001 titled "Report of Investigation" (also known as a "DEA Form 6") (Cooper's Ex. B, C, D, E, F, G, H), and the corresponding tape recordings attached to each form. (Cooper's Mem. 35-37.) Five of these forms, Cooper's Exhibits B, C, D, E, and F, document an ongoing investigation by government agents working with confidential informants in early 2001 in circumstances implicating Rauner in drug activity. Cooper's Exhibit G documents Rauner's June 6, 2001 proffer interview with government agents, and Cooper's Exhibit H documents the details of Rauner's arrest on June 5, 2001. Cooper argues that, had Volpe uncovered this information prior

to trial, he could have reviewed the investigator's notes, listened to the corresponding tape recordings, interviewed potential witnesses Sherman and Beach, and interviewed "the appropriate law enforcement official that was involved in each of the incidents." (Cooper's Reply 20-21.) Cooper generally argues that the evidence uncovered as a result of this process would have impeached Rauner, and would have established "[t]hat Rauner was a cocaine dealer only" and "[t]hat Rauner only delt [sic] in crack cocaine with McMillian." (*Id.* at 21.) The government argues that Cooper cannot demonstrate prejudice, because "all of the relevant matters reflected in the DEA Form 6's attached to Cooper's brief were covered extensively at trial during the direct and cross of Rauner, as well as the testimony of other witnesses." (Gov't Resp. 19, 23-29.)

Cooper has not identified any specific portion of Rauner's testimony that he believes would have been impeached with the use of the information contained in the relevant DEA Form 6's. Moreover, Cooper appears to be arguing two contradictory theories: (1) that Rauner *never* dealt in crack cocaine; and (2) that Rauner did deal in crack cocaine, but did not buy crack cocaine from Cooper. At trial, Rauner testified that he dealt in both crack cocaine and powder cocaine on various occasions. To the extent the DEA Form 6's identified by Cooper document Rauner's history of dealing in powder cocaine on specific occasions, this evidence is not inconsistent with Rauner's testimony at trial.

Rauner also testified that he bought crack cocaine from Cooper on numerous occasions beginning in 1998. (Trail Tr. 274:6-277:7.) The recorded documentation of Rauner's June 6, 2001 proffer session does not include this information, instead stating:

> "RAUNER related that he has been acquainted with Raymond COOPER, a.k.a. "RAY RAY" for approximately six years. RAUNER further related that RAUNER usually purchases between two and three kilograms of cocaine per/week from COOPER. RAUNER advised that RAUNER has on occasion purchased approximately eight kilograms of cocaine from COOPER. RAUNER further advised that the kilograms that RAUNER was arrested with on June 5, 2001 was obtained from COOPER. RAUNER advised that he usually pays approximately $21,500 for each kilogram of cocaine.
>
> RAUNER stated that he is also acquainted with Kalonji MCMILLIAN, a.k.a. "TUTU". RAUNER advised that he has purchased approximately one kilogram of crack cocaine from MCMILLIAN in the past. RAUNER advised that he purchased the kilogram of crack for approximately $22,500. RAUNER related that MCMILLIAN is the brother of COOPER. MCMILLIAN usually charges $1,000 to "cook up" (convert the cocaine to crack cocaine) a kilogram of cocaine.

(Cooper's Ex. G at 2.) Rauner's June 2001 statement that he bought powder cocaine from Cooper is not directly inconsistent with his trial testimony that he bought powder cocaine *and* crack cocaine from Cooper. Accordingly, this court is not persuaded that there is a reasonable probability the outcome of Cooper's trial would have been different had Volpe elicited the details of Rauner's June 2001 proffer statement on cross examination.

Because the DEA Form 6's now identified by Cooper do not contain any information suggesting a reasonable probability that the outcome of Cooper's trial would have been different if these forms had been uncovered before trial, Cooper's argument on this point cannot succeed.

The remainder of Cooper's arguments center around his assertion that Volpe's failure to adequately prepare resulted in an inability to submit the government's case to "meaningful adversarial testing." (Cooper's Mem. 16, 28, 41-43.) The court addresses this argument in Section II.A.2.c. below, and finds no ineffective assistance of counsel on these grounds. Finally, because the court has found no prejudice resulting from Volpe's lack of preparation, Cooper likewise cannot demonstrate prejudice resulting from Volpe's failure to seek a continuance for

purposes of engaging in further preparation.

b.    <u>Failure to Know and Comply with Proper Courtroom Procedures</u>

Cooper next argues that Volpe was ineffective for "exhibit[ing] a lack of knowledge of proper courtroom procedures." (Cooper's Mem. 17.) The court addresses Cooper's specific arguments on this point below.

First, Cooper argues that Volpe "was not aware, prior to the jury being called in, that Movant Cooper was wearing shackles" and, because "there was no strategic nor tactical reason for the shackles . . . the failure of counsel to notice this was unreasonable." (Cooper's Mem. 17.) Cooper has failed to demonstrate any prejudice resulting from Volpe's belated identification of this potential issue. Once Volpe became aware of Cooper's shackles, he raised an objection to their use. (Trial Tr. 245:14-21; 247:6-11.) The court overruled Volpe's objection, finding that the table skirts covering the tables for both the defense and the government prevented the jury from viewing the shackles. (*Id.* at 246:-247:2, 255:1-256:6.) The court has no reason to believe that the outcome of Cooper's trial would have been different if Volpe had made his objection at an earlier time.

Cooper next argues that Volpe was ineffective for failing to know how to lodge a proper objection, citing a portion of the transcript in which Volpe stated "No, but what I'm saying is – I don't know how to phase this objection, Your Honor." (Cooper's Mem. 17 (citing Trial Tr. 473:9-10).) In his reply, Cooper further notes that Volpe failed to stand when objecting, made untimely or "delayed" objections, and failed to lodge proper objections. (Cooper's Reply 5 (citing Trial Tr. 394-97, 399-402, 472-73, 653, 655).) On the other hand, the government cites a number of occasions on which the court sustained objections made by Volpe. (Gov't Resp. 9

(citing Trial Tr. 302-03, 397, 494).) Cooper does not explain how the evidence introduced at trial would have been different if Volpe had raised proper objections, and the court is not persuaded there is a reasonable probability that the outcome of Cooper's trial would have been different if Volpe had made proper objections to the testimony introduced by the government in the portions of the transcript identified by Cooper.

Next, Cooper argues the Volpe was ineffective for failing to sequester witnesses at trial, in violation of Federal Rule of Evidence 615. The portions of the transcript cited by Cooper in support of this argument identify an individual names "Holmes," who erroneously entered the courtroom at one point while Rauner was on the stand (Trial Tr. 330:21-23), and an unnamed witness "for the limited purpose, the very limited purpose of Mr. Cooper's actual residence address," who failed to "remain[ ] outside the courtroom throughout the trial" (Trial Tr. 1113:4-13). However, Cooper makes no effort to explain what the testimony of these witnesses would have been, or how he was prejudiced by any failure to properly sequester them. Rather, Cooper takes the position that from "[t]he very fact that this [unidentified] testimony was taken away from the jury, prejudice is clearly apparent." (Cooper's Reply 6-7.) As explained above, Cooper cannot merely assert that he is entitled to relief because Volpe's performance fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Cooper must *also* demonstrate prejudice, and he has failed to do so on this point.

Cooper further argues that Volpe was ineffective for failing to sequester potential witnesses Ron Cooper and Lance Lenoir. (Cooper's Mem. 34-35.) Cooper contends that Ron Cooper would have testified that he introduced Rauner and Cooper in 1996, thereby "contradict[ing] Rauner's testimony both as to where and when he met Movant Cooper," that

26

Ron Cooper "never observed any drug activity between Rauner and Cooper," and that Rauner later told Ron Cooper "he was sorry" for acting as a confidential informant in this case. (*Id.*) Cooper contends that Lance Lenoir would have testified "that Rauner never delt [sic] in crack cocaine, and that Rauner was known to set-up people for a sentence reduction." (*Id.* at 35.) Cooper attaches no affidavits from either of these witnesses, and cites no evidence that either of them was improperly sequestered. He also does not explain what actions Volpe is alleged to have unreasonably taken or omitted with regard to these witnesses. Cooper's bare assertions do not persuade the court that Volpe's performance was deficient, or that there is a reasonable probability the results of Cooper's trial would have been different if Volpe had taken some other unspecified action.

Finally, Cooper argues that Volpe's tardiness, errors, and "admitted incompetence" generally amounted to ineffective assistance of counsel. Cooper notes that Volpe was "scold[ed] and chid[ed] by the court," and contends that Volpe's ineptness "affected the minds of the jury" and "denied Cooper of a fair trial." (Cooper's Mem. 19.) Cooper cites to various portions of the transcript in support of this argument. However, the majority of these citations are to conversations between the court and counsel that took place outside the presence of the jury. Having reviewed the portions of the transcript identified by Cooper, the court finds Cooper has failed to demonstrate that Volpe's errors had the cumulative effect of prejudicing the outcome of Cooper's trial.

c.     Failure to Submit the Government's Case to Meaningful Adversarial Testing

Cooper's last argument as to Volpe's overall performance is that, taken as a whole, "the cumulative errors of attorney Volpe clearly establishes [sic] that he was incompetent to the

magnitude of not subjecting the prosecutions['] case to any meaningful adversarial testing."
(Cooper's Mem. 41 (citing *United States v. Cronic*, 466 U.S. 648 (1983).)  The court rejects
Cooper's contention that Volpe "took no actions to put on a meaningful defense," such that
Cooper was effectively denied the assistance of counsel altogether.  *See Barrow v. Uchtman*, 398
F.3d 597, 603 n.4 (7th Cir. 2005) (declining to apply *Cronic* unless there has been a complete
failure to test the prosecutor's case).  Where counsel has "presented opening and closing
arguments, and . . . cross-examined the State's witnesses (however inexpertly)," a petitioner
alleging ineffective assistance of counsel is not entitled to rely on the presumption of prejudice
set forth in *Cronic*.  *Id.*  The *Cronic* line of cases is therefore inapplicable, in light of Volpe's
active participation in Cooper's defense.

For the reasons set forth in above, the court concludes that Cooper has failed to
demonstrate that he is entitled to habeas corpus relief on the grounds that his trial counsel was
constitutionally ineffective.

B.      Ineffective Assistance of Counsel at Sentencing and on Appeal

Cooper further argues that he is entitled to habeas corpus relief due to the ineffective
assistance of counsel Nishay Sanan ("Sanan") at sentencing and on appeal.  Specifically, Cooper
asserts that Sanan should have argued the government failed to prove that the cocaine base
seized on June 8, 2001 was actually crack cocaine, as opposed to some other form of cocaine
base.  Cooper contends that "the district court would have granted relief" under *United States v.
Edwards*, 397 F.3d 570 (7th Cir. 2005), had this issue been raised.  (Cooper's Mem. 46.)

The two-part *Strickland* standard applies at sentencing and on appeal.  *See Welch v.
United States*, 604 F.3d 408, 425 (7th Cir. 2010) ("In order to show *Strickland* prejudice,

[petitioner] must show a reasonable probability that his underlying argument would have been accepted at the sentencing hearing."); *Suggs v. U.S.*, 513 F.3d 675, 678 (2008) ("We employ the familiar two-pronged test outlined by the Supreme Court in *Strickland* . . . to evaluate the effectiveness of both trial and appellate counsel."). In presenting his argument, Cooper does not identify any specific evidence suggesting that the cocaine base seized on June 8, 2001, was not actually crack cocaine. On the contrary, the record in this case includes numerous references to McMillian "cooking" powder cocaine for purposes of producing crack cocaine, Rauner's confirmation that he wanted to purchase "hard" cocaine from Cooper (which Rauner explained was slang for crack cocaine), and Officer Arthur's identification of the relevant seizure as crack cocaine. This court has no reason to believe that an *Edwards* argument would have been appropriate or successful, and Cooper's argument for ineffective assistance of counsel on this point is denied.

II.     Cooper's Claim that the Court Erred by Permitting Trial Counsel to Withdraw Previously-Filed Motion to Withdraw

Cooper next argues that he is entitled to relief because this court erred in permitting Volpe to withdraw his October 4, 2002 motion to withdraw, in light of Volpe's "stunning admission" that he "was in no position to render the effective assistance of counsel to which Mr. Cooper is undeniably entitled." (Cooper's Mem. 43-44.) For the reasons set forth in Sections I.A.1.b. and I.A.2.a. above, the court finds no error in this regard.

III.    Cooper's Claim of an Alleged *Brady* Violation

Finally, Cooper argues that he is entitled to relief due to the government's failure to turn over to the defense copies of the DEA Form 6's referenced in Section I.A.2.a. above. Under the

line of cases established by *Brady v. Maryland*, 373 U.S. 83 (1963), "a new trial is required if the evidence at issue is (1) favorable, (2) suppressed and (3) material to the defense." *United States v. Jumah*, 599 F.3d 799, 808 (2010). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667 (1985)).

Cooper argues that "[t]he DEA Form 6's could have, and would have effectively impeached Rauner's testimony as it related to when and where he met Cooper and the actual type of controlled substance he delt [sic] with Cooper in." (Cooper's Mem. 46.) Only one of the DEA Form 6's at issue includes any information about Cooper—Cooper's Exhibit G, which documents Rauner's June 6, 2001 proffer interview with government agents. This same form was used by McMillian's attorney, Royce, in an attempt to refresh the memory of DEA special agent Roger W. Ehler at trial. (Trial Tr. 1125-1132.) It therefore appears that Cooper's Exhibit G was not suppressed by the government. Moreover, even if Cooper's Exhibit G was suppressed, Cooper has not demonstrated a reasonable probability that the result of his trial would have been different if this form had been disclosed to the defense. As discussed above, Rauner's June 2001 statement that he bought powder cocaine from Cooper is not directly inconsistent with his trial testimony that he bought powder cocaine *and* crack cocaine from Cooper. The court therefore finds no *Brady* violation with regard to Cooper's Exhibit G.

With regard to Cooper's Exhibits B, C, D, E, F, and H, although Cooper asserts that "the record makes clear" these documents were not turned over to the defense (Cooper's Reply 27),

the record actually includes no evidence on this point. The government asserts that it "has been unable to determine" whether the remaining forms were produced in discovery (Gov't Resp. 26 n.3), and Cooper does not explain when or how he came into possession of these DEA Form 6's. For purposes of its current analysis, the court will assume that the government did not disclose Cooper's Exhibits B, C, D, E, F, or H to the defense.

Nevertheless, the court finds that Cooper cannot prevail on this claim. Cooper has identified no specific prejudice resulting from the suppression of these forms, and the court finds none apparent on the face of these documents. There is no evidence in any of the remaining DEA Form 6's directly material to Cooper's guilt or punishment. Insofar as these documents contain information likely to impeach Rauner's testimony, the court agrees with the government that the documents "were either irrelevant or cumulative of information already conveyed to defense counsel and communicated to the jury." (Gov't Resp. 26.) Accordingly, the court finds no *Brady* violation with respect to these documents.

IV     Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, this court denies the issuance of a certificate of appealability ("COA"). To be entitled to the issuance of a COA, the movant must have made a "substantial showing of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). This standard requires the movant to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack,* 529 U.S. at 484. The arguments expressed in Cooper's § 2255 motion either fail

31

to establish prejudice or they amount to challenges of his attorney's trial strategy. Consequently, this court finds that its resolution of Cooper's constitutional claims is not debatable among reasonable jurists.

CONCLUSION

For the reasons set forth above petitioner Raymond Cooper's "Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" under 28 U.S.C. § 2255 (Dkt. No. 1) and the issuance of a certificate of appealability are denied.

ENTER:

_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: November 8, 2010